In the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST Joseph W. WEIGEL, Attorney at Law:

OFFICE OF LAWYER REGULATION,
Complainant-Respondent-Cross-Appellant,

v.

Joseph W. WEIGEL,
Respondent-Appellant-Cross-Respondent.

Supreme Court

*No. 2011AP659–D. Oral argument October 4, 2012.
—Decided December 19, 2012.*

2012 WI 124

(Also reported in 823 N.W.2d 798.)

For the respondent-appellant-cross-respondent, there were briefs filed by *Terry E. Johnson, Peterson, Johnson & Murray, S.C.,* Milwaukee, and oral argument by *Terry E. Johnson.*

For the Office of Lawyer Regulation, there were briefs filed by *Paul Schwarzenbart,* Madison, and oral argument by *Paul Schwarzenbart.*

¶ 1. PER CURIAM. Attorney Joseph W. Weigel has appealed from a referee's report concluding that he engaged in professional misconduct and recommending that his license to practice law in Wisconsin be suspended for 30 months. The Office of Lawyer Regulation (OLR) has cross-appealed as to the sanction recom-

mended by the referee. The OLR asks this court to revoke Attorney Weigel's license to practice law.

¶ 2.   We conclude that the referee's findings of fact are supported by satisfactory and convincing evidence. We further determine that the seriousness of Attorney Weigel's misconduct warrants the revocation of his license to practice law in Wisconsin. We also conclude that the full costs of the proceeding, which are $24,309.84 as of November 6, 2012, should be assessed against Attorney Weigel, and we conclude that Attorney Weigel should be required to reimburse any shortfall in his law firm's trust account.

¶ 3.   Attorney Weigel was admitted to practice law in Wisconsin in 1960 and practices in Milwaukee. In 1979 he was privately reprimanded for failing to promptly notify a client of the adverse result in her damages action against an opposing party and an insurance company. In 2012 he was publicly reprimanded for entering into a stock redemption agreement that contained a "non-compete" clause restricting the rights of his former partner, Alvin Eisenberg, to practice law after termination of their relationship, and for misleading clients and the public by continuing to use the firm name, "Eisenberg, Weigel, Carlson, Blau & Clemens, S.C.," after Attorney Eisenberg left the firm. *In re Disciplinary Proceedings Against Weigel,* 2012 WI 71, 342 Wis. 2d 129, 817 N.W.2d 835.

¶ 4.   As with Attorney Weigel's most recent disciplinary case, the facts underlying this matter also arise out of the dissolution of his practice with Alvin Eisenberg. The firm now known as Weigel, Carlson, Blau & Clemens, S.C., was formerly known as Eisenberg, Weigel, Carlson, Blau & Clemens, S.C. The firm was incorporated in 1975 by Alvin Eisenberg as the sole shareholder. Throughout its history the firm has concen-

10

trated its practice in the area of representing injured persons in personal injury matters.

¶ 5.    Attorney Weigel joined the firm in 1990 as a shareholder and officer. Prior to March 1, 1999, Attorney Weigel was a four percent shareholder in the firm as well as an officer. A number of other attorneys also held a four percent interest in the firm. Pursuant to the stock redemption agreement of March 1, 1999, Attorney Weigel, along with Attorneys Clemens and Blau, became the sole shareholders in the firm. Attorney Weigel has served as president of the firm since that time.

¶ 6.    Prior to March 1, 1999, Attorney Eisenberg controlled the firm's trust accounts and generally controlled the firm. In 1995 or 1996 the firm sustained a third-party forgery loss in excess of $50,000 from its trust account. In 1996 or 1997 the firm sustained another third-party forgery loss of approximately $20,000 from its trust account. Those trust account theft losses were not reported to the OLR and the trust account was not replenished to replace the missing funds. In addition, the trust account was not isolated or replaced with a new trust account and the firm did nothing to determine the exact amount of the trust account deficiency.

¶ 7.    Although Attorney Weigel had signature authority on the trust account for at least part of the 1990s, he says he was not specifically aware of the losses sustained to the account at the time of the thefts. He was, however, aware of the losses at the time he entered into the stock redemption agreement in March 1999. Both before and after March 1999, neither the prior nor successor law firm regularly kept transaction ledgers, individual client ledgers, copies of monthly bank statements, deposit records, disbursement records, or monthly reconciliation reports for the trust account as required by supreme court rules.

11

¶ 8.   Attorney Weigel has stated that the deficits in the trust account since 1999 have ranged from $100,000 to over $1,000,000. He estimates the current trust account deficit to be approximately $100,000 to $150,000.

¶ 9.   Attorney Weigel testified at the hearing before the referee that without adequate trust account records, the firm, since March 1999, has reacted to claims by individuals and entities who did not receive their proper share of settlements by going to each client's signed settlement statement to see if the claimed amount had been paid. Attorney Weigel has said that since March 1999, he and the other shareholders in the firm have reduced the deficit in the trust account by injecting personal funds into the account or by not taking the full distributions of amounts payable to the firm for attorney fees earned and costs advanced.

¶ 10.   Attorney Weigel asserts that clients have always received their net share of settlement proceeds in a timely manner, but he admits that payments to third parties have been delayed in order to avoid having checks drawn on the trust account payable to third parties returned for insufficient funds. Attorney Weigel also admits the firm's trust account has been out of balance since before 1999 and the problem continues to the present.

¶ 11.   From March 1999 through 2007 the firm maintained an IOLTA trust account with Norwest Bank, now known as Wells Fargo Bank, in Milwaukee. In October of 2003 the firm opened a second IOLTA trust account with Wells Fargo Bank. On January 11, 2007, Wells Fargo Bank issued an insufficient funds notice to the firm relative to the second trust account. The OLR received a copy of the notice pursuant to SCR 20:1.15(h)(3). When OLR did not receive information from Wells Fargo Bank indicating that the notice had

been sent through inadvertence or mistake, by letter dated January 26, 2007, the OLR notified Attorney Weigel that it had a duty to investigate the overdraft in the trust account and that Attorney Weigel was required to provide a written response. Various correspondence between Attorney Weigel and the OLR ensued.

¶ 12. On January 15, 2007, in the context of a separate matter under investigation, the OLR served a subpoena duces tecum directed to Attorney Weigel requiring the law firm to produce trust account records that are required to be kept under SCR 20:1.15. After Attorney Weigel failed to supply trust account records pursuant to the subpoena, the OLR suggested a protocol by which Attorney Weigel would produce all trust account records of the firm so that OLR could conduct an audit. Attorney Weigel produced some records but was unable to produce all records requested.

¶ 13. Since May 2003 Attorney Weigel has been a signatory on an IOLTA trust account at Tri City National Bank of Milwaukee for a business partnership. Attorney Weigel failed to disclose the Tri City National trust account on each of the yearly trust account/ WisTAF certifications filed with the State Bar of Wisconsin for the years 2005 through 2009. In addition, in the trust account/WisTAF certificate portions of the membership dues and supreme court assessments statements filed with the State Bar of Wisconsin for the years 2005 through 2009, Attorney Weigel falsely certified that he complied with each of the recordkeeping requirements set forth in SCR 20:1.15.

¶ 14. Vance Masci, M.D., MPH, is a physician licensed in the state of Wisconsin who has a specialty in occupational medicine. Dr. Masci was the owner and proprietor of Milwaukee Occupational Medicine, S.C. (MOMS). Between 2002 and 2005 certain clients who

retained Attorney Weigel's firm to assert personal injury claims were provided medical services by MOMS, which in turn billed the clients for the cost of those medical services.

¶ 15. After settling a personal injury matter, Attorney Weigel has a standard business practice whereby the firm and the client execute a settlement statement. The settlement statement provides that the client understands that any charges not reflected on the statement will be the client's sole responsibility. To the extent that Attorney Weigel's firm trust account records are available, they show that payments due to MOMS for medical services provided to MOMS' clients generally were made six or more months after the firm had paid itself for legal fees and costs earned in the settled cases. Dr. Masci filed a grievance with the OLR against Attorney Weigel in 2005.

¶ 16. In May 2004 L.B. retained Attorney Weigel's firm to represent her in a personal injury case arising out of an auto accident. In August of 2005, L.B. received a notice from the University of Wisconsin Medical Foundation saying she was being billed $25 for an insufficient funds charge because a check from Attorney Weigel's firm for payment of expenses incurred in the case had bounced. L.B. called the firm and was told it would take care of the charge, but it did not do so. L.B. paid for the charge. Although the firm told her it would reimburse her, it did not do so.

¶ 17. On or about June 6, 2006, L.B. agreed to settle her claim arising out of the auto accident for $100,000. Sometime prior to June 8, 2006, American Family Insurance Company, the liability insurer for the other driver involved in L.B.'s case, transmitted $100,000 to the firm in settlement of the claim. The settlement funds were deposited in the firm's trust

14

account with Wells Fargo Bank. On June 8, 2006, L.B. executed a settlement statement confirming her agreement to settle her case. The firm gave L.B. a check in the net amount of $44,138.27. That check cleared.

¶ 18.   Although the settlement statement showed the sum of $37,381.93 was due and owing to the firm for attorney fees and costs in the L.B. case, no corresponding check or deposit in that amount appears in the firm's trust account records, and Attorney Weigel provided no back-up documentation showing the date the firm was paid on the L.B. file. In addition to providing for payment to the firm for attorney fees and expenses, the settlement statement in L.B.'s case also listed "outstanding bills and liens paid out of settlement proceeds" to third parties for medical expenses for treatment necessitated by L.B.'s injuries sustained in the accident. L.B. understood the firm would promptly remit payment to the third parties identified in the settlement statement.

¶ 19.   In late October 2006 L.B. received a letter from the administrator for her health insurance plan saying it had learned her claim had been settled and that the sum of $15,243.01 was due and owing from her to reimburse the plan for sums paid on her behalf for medical services arising out of the accident. This amount differed from the amount of $15,000 that was shown on the settlement statement as the sum due to L.B.'s health insurance plan, and it also differed from the amount shown on the settlement statement as the total of the plan's claim.

¶ 20.   In January 2007 L.B. received a letter from the collection agency for Aurora Health Care stating that $499.40 remained due and owing for services and threatening collection action. Also in January of 2007, L.B. received a statement from Cully R. White Neurosurgery & Spine, S.C., stating that the sum of $531.72 remained due and owing.

15

¶ 21. In February 2007 L.B. filed a grievance against Attorney Weigel in connection with the failure to pay third parties as directed by her in the settlement statement she and the firm had signed. Although Attorney Weigel told OLR staff that all of L.B.'s medical bills had been paid prior to the time she filed the grievance, he supplied no records showing the date or dates upon which payments were made, and the trust account records supplied by Attorney Weigel contained no evidence of payments from the trust accounts in the exact amounts shown on the settlement statement as owed to L.B.'s creditors.

¶ 22. On March 24, 2011, the OLR filed a complaint against Attorney Weigel alleging ten counts of misconduct:

> COUNT ONE: By deliberately failing to promptly deliver funds to Milwaukee Occupational Medicine, S.C. ("MOMS") and other third-party payees, as directed by clients of his law firm, including grievant-client [L.B.], Weigel violated former SCR 20:1.15(d)(1)[1] and SCR 20:8.4(c).[2]

---

[1] Former SCR 20:1.15(d)(1) (effective July 1, 2004, through June 30, 2007) provided:

(d) Prompt notice and delivery of property.

(1) Notice and disbursement. Upon receiving funds or other property in which a client has an interest, or in which the lawyer has received notice that a 3rd party has an interest identified by a lien, court order, judgment, or contract, the lawyer shall promptly notify the client or 3rd party in writing. Except as stated in this rule or otherwise permitted by law or by agreement with the client, the lawyer shall promptly deliver to the client or 3rd party any funds or other property that the client or 3rd party is entitled to receive.

[2] SCR 20:8.4(c) (former and current) states it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation; . . . ."

COUNT TWO: By failing to maintain a transaction register for his law firm's trust accounts since July 1, 2004, Weigel violated former and current SCR 20:1.15(f)(1)a.[3]

COUNT THREE: By failing to maintain indi-

---

[3] Former SCR 20:1.15(f)(1)a. (effective July 1, 2004, through December 31, 2009) provided:

(f) Record-keeping requirements for trust accounts.

(1) Demand accounts. Complete records of a trust account that is a demand account shall include a transaction register; individual client ledgers; a ledger for account fees and charges, if law firm funds are held in the account pursuant to sub. (b)(3); deposit records; disbursement records; monthly statements; and reconciliation reports, subject to all of the following:

a. Transaction register. The transaction register shall contain a chronological record of all account transactions, and shall include all of the following:

1. the date, source, and amount of all deposits;

2. the date, check or transaction number, payee and amount of all disbursements, whether by check, wire transfer, or other means;

3. the date and amount of every other deposit or deduction of whatever nature;

4. the identity of the client for whom funds were deposited or disbursed; and

5. the balance in the account after each transaction.

Current SCR 20:1.15(f)(1)a. (effective January 1, 2010) provides:

(f) Record-keeping requirements for all trust accounts.

(1) Draft accounts. Complete records of a trust account that is a draft account shall include a transaction register; individual client ledgers for IOLTA accounts and other pooled trust accounts; a ledger for account fees and charges, if law firm funds are held in the account pursuant to sub. (b)(3); deposit records; disbursement records; monthly statements; and reconciliation reports, subject to all of the following:

17

vidual client ledgers in the form of a subsidiary ledger for each individual client for the firm's trust accounts, Weigel violated former SCR 20:1.15(e)(iii)[4] and former and current SCR 20:1.15(f)(1)b.[5]

COUNT FOUR: By failing to complete trust account deposit slips in accordance with SCR 20:1.15, and

a. Transaction register. The transaction register shall contain a chronological record of all account transactions, and shall include all of the following:

1. the date, source, and amount of all deposits;

2. the date, check or transaction number, payee and amount of all disbursements, whether by check, wire transfer, or other means;

3. the date and amount of every other deposit or deduction of whatever nature;

4. the identity of the client for whom funds were deposited or disbursed; and

5. the balance in the account after each transaction.

[4] Former SCR 20:1.15(e)(iii) (effective through June 30, 2004) provided:

Complete records of trust account funds and other trust property shall be kept by the lawyer and shall be preserved for a period of at least six years after termination of the representation. Complete records shall include: . . . (iii) a subsidiary ledger containing a separate page for each person or company for whom funds have been received in trust, showing the date and amount of each receipt, the date and amount of each disbursement, and any unexpended balance, . . . ."

[5] Former SCR 20:1.15(f)(1)b. (effective July 1, 2004, through December 31, 2009) provided:

(f) Record-keeping requirements for trust accounts. (1) Demand accounts. . . .

b. Individual client ledgers. A subsidiary ledger shall be maintained for each client or matter for which the lawyer receives trust funds, and the lawyer shall record each receipt and disbursement of that client's funds and the balance following each transaction. A lawyer shall not disburse funds from the trust account

18

by failing to preserve complete copies of the monthly statements and deposit slips, Weigel violated former SCR 20:1.15(e)(vi)[6] and former and current SCR 20:1.15(f)(1)d.[7] and former and current

that would create a negative balance with respect to any individual client or matter.

Current SCR 20:1.15(f)(1)b. (effective January 1, 2010) provides:

(f) Record-keeping requirements for all trust accounts. (1) Draft accounts. ...

b. Individual client ledgers. A subsidiary ledger shall be maintained for each client or 3rd party for whom the lawyer receives trust funds that are deposited in an IOLTA account or any other pooled trust account. The lawyer shall record each receipt and disbursement of a client's or 3rd party's funds and the balance following each transaction. A lawyer shall not disburse funds from an IOLTA account or any pooled trust account that would create a negative balance with respect to any individual client or matter.

[6] Former SCR 20:1.15(e)(vi) (effective through June 30, 2004) provided:

Complete records of trust account funds and other trust property shall be kept by the lawyer and shall be preserved for a period of at least six years after termination of the representation. Complete records shall include: . . . (vi) monthly statements, including canceled checks, vouchers or share drafts, and duplicate deposit slips.

[7] Former SCR 20:1.15(f)(1)d. (effective July 1, 2004, through December 31, 2009) provided:

(f) Record-keeping requirements for trust accounts. (1) Demand accounts. ...

d. Deposit records. Deposit slips shall identify the name of the lawyer or law firm, and the name of the account. The deposit slip shall identify the amount of each deposit item, the client or matter associated with each deposit item, and the date of the deposit. The lawyer shall maintain a copy or duplicate of each deposit slip. All deposits shall be made intact. No cash, or other form of disburse ment, shall be deducted from a deposit. Deposits of wired funds shall be documented in the account's monthly statement.

SCR 20:1.15(e)(6).[8]

COUNT FIVE: By failing to maintain and preserve complete trust account disbursement records, Weigel violated former SCR 20:1.15(e)(ii)[9] and former and current SCR 20:1.15(f)(1)e.[10] and former and current SCR 20:1.15(e)(6).

Current SCR 20:1.15(f)(1)d. (effective January 1, 2010) states:

(f) Record-keeping requirements for all trust accounts. (1) Draft accounts. . . .

d. Deposit records. Deposit slips shall identify the name of the lawyer or law firm, and the name of the account. The deposit slip shall identify the amount of each deposit item, the client or matter associated with each deposit item, and the date of the deposit. The lawyer shall maintain a copy or duplicate of each deposit slip. All deposits shall be made intact. No cash, or other form of disbursement, shall be deducted from a deposit. Deposits of wired funds shall be documented in the account's monthly statement.

[8] SCR 20:1.15(e)(6) (former and current, effective July 1, 2004) provides:

(e) Operational requirements for trust accounts.

. . .

(6) Record retention. A lawyer shall maintain complete records of trust account funds and other trust property and shall preserve those records for at least 6 years after the date of termination of the representation.

[9] Former SCR 20:1.15(e)(ii) (effective through June 30, 2004) provided:

Complete records of trust account funds and other trust property shall be kept by the lawyer and shall be preserved for a period of at least six years after termination of the representation. Complete records shall include: . . . (ii) a disbursements journal, listing the date and payee of each disbursement, with all disbursements being paid by check, . . . .

[10] Former SCR 20:1.15(f)(1)e. (effective July 1, 2004, through December 31, 2009) stated:

20

COUNT SIX: By failing to maintain and preserve complete monthly reconciliation reports, Weigel vio-

(f) Record-keeping requirements for trust accounts. (1) Demand accounts. . . .

e. Disbursement records.

1. Checks. Checks shall be pre-printed and prenumbered. The name and address of the lawyer or law firm, and the name of the account shall be printed in the upper left corner of the check. Trust account checks shall include the words "Client Account," or "Trust Account," or words of similar import in the account name. Each check disbursed from the trust account shall identify the client matter and the reason for the disbursement on the memo line.

2. Canceled checks. Canceled checks shall be obtained from the financial institution. Imaged checks may be substituted for canceled checks.

3. Imaged checks. Imaged checks shall be acceptable if they provide both the front and reverse of the check and comply with the requirements of this paragraph. The information contained on the reverse side of the imaged checks shall include any endorsement signatures or stamps, account numbers, and transaction dates that appear on the original. Imaged checks shall be of sufficient size to be readable without magnification and as close as possible to the size of the original check.

4. Wire transfers. Wire transfers shall be documented by a written withdrawal authorization or other documentation, such as a monthly statement of the account that indicates the date of the transfer, the payee, and the amount.

Current SCR 20:1.15(f)(1)e. (effective January 1, 2010) states:

(f) Record-keeping requirements for all trust accounts. (1) Draft accounts. . . .

e. Disbursement records.

1. Checks. Checks shall be pre-printed and prenumbered. The name and address of the lawyer or law firm, and the name of the account shall be printed in the upper left corner of the check. Trust account checks shall include the words "Client Account," or "Trust Account," or words of similar import in the account name. Each check disbursed from the trust account shall identify the client matter and the reason for the disbursement on the memo line.

21

lated former SCR 20:1.15(e)(v)[11] and former and current SCR 20:1.15(f)(1)g.[12] and former and current SCR 20:1.15(e)(6).

2. Canceled checks. Canceled checks shall be obtained from the financial institution. Imaged checks may be substituted for canceled checks.

3. Imaged checks. Imaged checks shall be acceptable if they provide both the front and reverse of the check and comply with the requirements of this paragraph. The information contained on the reverse side of the imaged checks shall include any endorsement signatures or stamps, account numbers, and transaction dates that appear on the original. Imaged checks shall be of sufficient size to be readable without magnification and as close as possible to the size of the original check.

4. Wire transfers. Wire transfers shall be documented by a written withdrawal authorization or other documentation, such as a monthly statement of the account that indicates the date of the transfer, the payee, and the amount.

[11] Former SCR 20:1.15(e)(v) (effective through June 30, 2004) stated:

Complete records of trust account funds and other trust property shall be kept by the lawyer and shall be preserved for a period of at least six years after termination of the representation. Complete records shall include: . . . (v) a determination of the cash balance (checkbook balance) at the end of each month, taken from the cash receipts and cash disbursement journals and a reconciliation of the cash balance (checkbook balance) with the balance indicated in the bank statement, . . . .

[12] Former SCR 20:1.15(f)(1)g. (effective July 1, 2004, through December 30, 2009) provided:

(f) Record-keeping requirements for trust accounts. (1) Demand accounts. . . .

g. Reconciliation reports. For each trust account, the lawyer shall prepare and retain a printed reconciliation report on a regular and periodic basis not less frequently than every 30 days. Each reconciliation report shall show all of the following balances and verify that they are identical:

1. the balance that appears in the transaction register as of the reporting date;

22

COUNT SEVEN: By converting funds belonging to clients, including but not limited to [L.B.] and clients who were also patients of MOMS, by systematically using client funds to pay obligations owed to other clients and/or to pay third party creditors of other clients, Weigel violated former and current SCR 20:8.4(c).

COUNT EIGHT: By failing to produce trust account records as requested by OLR in the course of its

2. the total of all subsidiary ledger balances for IOLTA accounts and other pooled accounts, determined by listing and totaling the balances in the individual client ledgers and the ledger for account fees and charges, as of the reporting date; and

3. the adjusted balance, determined by adding outstanding deposits and other credits to the balance in the financial institution's monthly statement and subtracting outstanding checks and other deductions from the balance in the monthly statement.

Current SCR 20:1.15(f)(1)g. (effective January 1, 2010) provides:

(f) Record-keeping requirements for all trust accounts. (1) Draft accounts. . . .

g. Reconciliation reports. For each trust account, the lawyer shall prepare and retain a printed reconciliation report on a regular and periodic basis not less frequently than every 30 days. Each reconciliation report shall show all of the following balances and verify that they are identical:

1. the balance that appears in the transaction register as of the reporting date;

2. the total of all subsidiary ledger balances for IOLTA accounts and other pooled accounts, determined by listing and totaling the balances in the individual client ledgers and the ledger for account fees and charges, as of the reporting date; and

3. the adjusted balance, determined by adding outstanding deposits and other credits to the balance in the financial institution's monthly statement and subtracting outstanding checks and other deductions from the balance in the monthly statement.

investigations, Weigel violated former and current SCR 20:1.15(e)(7).[13]

COUNT NINE: By failing to disclose the existence of the Tri[ ]City National trust accounts in the certification part of the annual state bar dues statement, and by falsely certifying that he had complied with each of the recordkeeping requirements set forth in SCR 20:1.15, Weigel violated former and current SCR 20:1.15(i)(1)[14] and former and current SCR 20:8.4(c).

---

[13] SCR 20:1.15(e)(7) (former and current, effective July 1, 2004) provides:

> (e) Operational requirements for trust accounts.
>
> . . .
>
> (7) Production of records. All trust account records have public aspects related to a lawyer's fitness to practice. Upon request of the office of lawyer regulation, or upon direction of the supreme court, the records shall be submitted to the office of lawyer regulation for its inspection, audit, use, and evidence under any conditions to protect the privilege of clients that the court may provide. The records, or an audit of the records, shall be produced at any disciplinary proceeding involving the lawyer, whenever material. Failure to produce the records constitutes unprofessional conduct and grounds for disciplinary action.

[14] Former SCR 20:1.15(i)(1) (effective July 1, 2004, through June 30, 2007) provided:

> (i) Certification of compliance with trust account rules.
>
> (1) Annual requirement. A member of the state bar of Wisconsin shall file with the state bar of Wisconsin annually, with payment of the member's state bar dues or upon any other date approved by the supreme court, a certificate stating whether the member is engaged in the practice of law in Wisconsin. If the member is practicing law, the member shall state the account number of any trust account, and the name of each financial institution in which the member maintains a trust account, a safe deposit box, or both, as required by SCR 20:1.15. The state bar shall supply to each member, with the annual dues statement, or at any other time directed by the supreme court, a form on which the certification must be made.

24

COUNT TEN: By failing to disclose to OLR in the course of the investigations that he deliberately caused his law firm not to promptly reimburse MOMS for client medical expenses in accordance with the clients' directions and to not promptly pay [L.B.'s] third party creditors as directed, and instead represented to OLR that the delayed payment[s] were caused by other factors, Weigel violated SCR 22.03(6)[15] and former and current SCR 20:8.4(c).

¶ 23. James J. Winiarski was appointed referee. A hearing was held on January 31, 2012. The witnesses at the hearing were Attorney Weigel and Timothy P. Muehler, a certified public accountant and attorney, who served as a forensic auditor for the OLR. At the beginning of the hearing, the parties submitted a partial stipulation of facts, which included multiple exhibits. In the stipulation and/or his live testimony, Attor-

---

Current SCR 20:1.15(i)(1) (effective July 1, 2007) provides:

(i) Certification of compliance with trust account rules.

(1) Annual requirement. A member of the state bar of Wisconsin shall file with the state bar of Wisconsin annually, with payment of the member's state bar dues or upon any other date approved by the supreme court, a certificate stating whether the member is engaged in the practice of law in Wisconsin. If the member is practicing law, the member shall state the account number of any trust account, and the name of each financial institution in which the member maintains a trust account, a safe deposit box, or both, as required by this section. The state bar shall supply to each member, with the annual dues statement, or at any other time directed by the supreme court, a form on which the certification must be made.

[15] SCR 22.03(6) provides:

In the course of the investigation, the respondent's wilful failure to provide relevant information, to answer questions fully, or to furnish documents and the respondent's misrepresentation in a disclosure are misconduct, regardless of the merits of the matters asserted in the grievance.

ney Weigel admitted that he cannot produce many required trust account records;[16] that he failed to promptly deliver funds to third-party payees; that he would pay whichever of the third parties was badgering him most for payment; that he commingled client trust funds with firm assets by leaving earned fees in the trust account; and that he injected firm funds into the trust account to cover deficits. Attorney Weigel estimated the deficit in the trust account from 1999 to the present as being between $100,000 and $1,000,000, and he estimated the current trust account deficit to be approximately $100,000.

¶ 24. Attorney Weigel stated that before he bought out Alvin Eisenberg, he understood the trust account was running a deficit but he claimed he did not know the full extent of the deficit. In his testimony at the hearing, Attorney Weigel said that when he and his partners bought Alvin Eisenberg out, "I would have believed the problem to be closer in the $200,000, $250,000 range. After we bought him out and some other things started to come to light, it was obvious that we were closer to the million dollar range than the $250,000 range." When asked how long after the March 1999 buyout Attorney Weigel came to the conclusion that the trust account was running closer to a million dollar deficit, he estimated "somewhere over the course of six months or so," which would have meant late 1999 or early 2000. When asked whether he gave any thought to reporting Alvin Eisenberg to the relevant authorities and walking away, Attorney Weigel responded, "I thought of it but just made a moral decision

---

[16] Attorney Weigel claims that when Eisenberg owned the firm, the building had flooding problems that destroyed some records. He also claims a computer crash destroyed other records.

not to do that." Attorney Weigel later elaborated by saying:

> [A]t that point I have got to make a decision: either I walk away from the thing, contact the Office of Lawyer Regulation and say, hey, this is where we're at but it didn't happen on my watch at which point the whole— you know, we probably had 70 families out of a job, the company's out of business, the law firm is out of business, and nobody gets paid. Who is going to come in and pay those people.

¶ 25. When asked if he ever sent Alvin Eisenberg a writing complaining about the fact that he had inherited a million dollar deficit, Attorney Weigel answered, "No, not really."

¶ 26. The referee issued his report and recommendation on April 23, 2012. The referee found that the OLR had met its burden of proof as to all of the counts of misconduct alleged in its complaint. The referee said:

> Weigel testified that he believed the trust account was out of balance at the time he and the other attorneys purchased the Firm from Eisenberg on March 1, 1999. Any and all problems with the trust account at the time of purchase, including any deficits, could have been isolated by opening a new trust account at that time and by making no further use of the existing trust account for new cases. Weigel maintains he did not do so because he wished to make sure all obligations of the existing trust account were properly paid. However, those goals could also have been met by opening a new trust account, while still dealing with the problems in the existing trust account.

> I am most suspect of Weigel's claim that the Firm continued to use the trust account in order to make

whole clients and others with money due from the trust account. The evidence would certainly support a conclusion that Weigel and the law Firm did not wish to account for or explain the many deficits and problems with the trust account.

Even if there were substantial problems with the trust account at the time of purchase from Eisenberg in 1999, that does not excuse Weigel and the Firm from maintaining all trust account records required by Supreme Court Rules after the purchase. The need for proper trust account records was exacerbated by any pre-existing problems with the trust account. Such records would have isolated the pre-existing trust account problems and possibly provided evidence that Weigel and the new Firm were not responsible for some of the prior trust account problems.

. . .

It is quite clear from the evidence that Weigel and his law Firm made a deliberate decision to not acknowledge and report the many problems with the trust account, and instead attempted to pay their way out of the problems. The lesser "evil" was to pay each subsequent claim made against the trust account. One has to consider the sheer magnitude of the many problems that must have existed in the trust account between 1999 and 2007, which would lead Weigel and the law Firm to be willing to pay off hundreds of thousands of dollars in claims, allegedly caused by Eisenberg before 1999, without disclosure to the Office of Lawyer Regulation.

¶ 27.    The referee said there was no evidence that any client suffered a monetary loss as a result of Attorney Weigel's and the firm's trust account misconduct since all amounts due individuals were ultimately paid in full. The referee also noted there was no evidence of direct misappropriation by Attorney Weigel or the firm. The referee went on to say:

28

However, the evidence clearly shows there have been long delays in paying individuals funds due them from the trust account. This is a form of harm. In addition, using funds received on behalf of current clients to pay the obligations of past clients is also a form of harm. . . .

Simply because funds were ultimately obtained from some source to pay off individuals with a claim against the trust account, does not mean there was not harm to clients. When a client trust account is properly maintained, the existing funds always equal the liabilities. When liabilities exceed existing trust funds, clients and creditors of the trust account suffer increased risk of nonpayment. This is a form of harm.

. . .

Today, Weigel estimates the current deficit in the trust account to be approximately $100,000.00. This means that clients and creditors with proper claims against the trust account are currently at risk because there are insufficient funds within the trust account to pay those obligations. This is also a form of harm. In essence, the entire scheme that has been used by [Weigel] and the law Firm for approximately the past thirteen years has put all individuals with a proper interest in the trust account at risk.

¶ 28. Turning to the appropriate level of discipline to impose for Attorney Weigel's misconduct, the referee said mitigating factors in the case included the fact there was no evidence Attorney Weigel stole any money from the trust account; there was no evidence any individual or entity has experienced a monetary loss from the mishandling of the trust account; Attorney Weigel's general character and his positive reputation in the community; and his many years of practice as a lawyer with minimal prior disciplinary action.

¶ 29. The referee said aggravating factors in the case included the length of time the trust account has been out of balance; the fact that a deficit still exists despite hundreds of thousands of dollars being put into the account; the intentional failure to keep trust account records; the deliberate failure to disclose all trust accounts to the OLR as required on a yearly basis; the intentional failure to isolate and stop using the problematic account by opening a new one; the intentional delay in timely paying trust account obligations; the "Ponzi" scheme type of thinking that occurred in response to the problems; the length of time it took Attorney Weigel to acknowledge his failure to keep trust account records; and Attorney Weigel's failure to bring the trust account problem to the OLR's attention prior to 2007. The referee said:

> I am particularly concerned with the number of years that have elapsed since the 1999 purchase, during which the trust account has been substantially out of balance and no trust account records maintained. Any reasonable lawyer, upon learning that a trust account is out of balance and has a deficit, would stop using the account, thereby isolating the problems, and begin using a new trust account. I do not accept Weigel's explanation that he did so to make certain all clients and individuals with a claim against the trust account would ultimately be paid. That goal could have been met as easily with the establishment of a new trust account, with or without the knowledge of OLR.

> I believe profit motives as well as selfish motives [led] to Weigel's decision to continue to use the out of balance and deficit prone trust account. Upon learning of the trust account problems, an intentional decision was made to attempt to cover up the problems. The intent was to try to alleviate the substantial trust account problems by a series of misplaced actions which

30

included [commingling] of funds, delayed trust account payments, and Ponzi scheme type actions, which included paying prior clients from settlement funds received on behalf of new clients.

. . .

It is hard to imagine a more intentional failure to maintain trust account records than exists in this case. Also, the period of time the trust account has been out of balance with hundreds of thousands of dollars of deficits, is striking. Simply, there was an intentional failure to follow Supreme Court Rules for many years. Weigel and the Firm sought to hide the many trust account problems, rather than acknowledging those problems and [dealing] with them in a proper fashion.

¶ 30.   The referee concluded that an appropriate sanction for Attorney Weigel's misconduct was to suspend his license for a period of 30 months. The referee also recommended that Attorney Weigel should be ordered to pay all costs of the disciplinary proceeding, and the referee recommended this court consider entering an order dealing with the current trust account problems and requiring Attorney Weigel to pay restitution in the form of being responsible for all current trust account deficits.

¶ 31.   Both parties have appealed.

¶ 32.   Attorney Weigel argues that the OLR has failed to prove by clear, satisfactory, and convincing evidence that he converted client or third-party funds. He asserts he did not create the deficit in the trust account "but he resolved to do right by the firm's clients and fix it." Attorney Weigel recognizes that his efforts to correct the deficit violated supreme court rules. However, he contends his efforts were successful because the deficit was reduced from around $1,000,000 to less than $150,000 today. Attorney Weigel also admits he did not

maintain ledgers as required by supreme court rules and that the firm's trust account was substantially out of balance throughout his tenure as managing partner of the firm. However, he says "his actions to correct the problem caused by Eisenberg's thefts were guided by personal conscience and moral judgment, as the Rules demand."

¶ 33.    Attorney Weigel says in Counts One and Seven of its complaint, the OLR alleges that he violated former SCR 20:1.15(d)(1) and SCR 20:8.4(c) by failing to promptly deliver funds to third parties and by converting client funds. He says the only third party identified by the OLR was MOMS. Attorney Weigel says his uncontroverted testimony established that MOMS agreed to accept payments on a rolling basis in consideration for future business.

¶ 34.    Attorney Weigel also argues the OLR failed to prove he converted client funds. He claims the OLR has acknowledged it presented no client or third party who asserts an actual monetary loss due to irregularities in the trust account. However, he says the OLR now argues that Attorney Weigel must prove he did not convert client funds.

¶ 35.    Attorney Weigel also disagrees with the referee's recommendation for a 30–month suspension. He submits the appropriate discipline lies between a public reprimand and a 60–day suspension.

¶ 36.    The OLR asserts that the referee correctly concluded that Attorney Weigel violated former SCR 20:1.15(d)(1) and SCR 20:8.4(c) as alleged in Counts One and Seven. The OLR says Attorney Weigel fails to acknowledge the referee's specific findings that Attorney Weigel admitted his firm deliberately paid certain creditors involved in settlements on a tardy and late basis because there were insufficient funds in the trust

account, and that they would pay the squeakiest wheel when there were insufficient funds in the trust account to pay all individuals who had a claim against the trust account.

¶ 37. The OLR says Attorney Weigel admitted he systematically delayed payments to third parties. The OLR reasons that since SCR 20:1.15 prohibits commingling a lawyer's personal funds with client trust funds, it follows that the rule does not contemplate a lawyer "borrowing" money from one client to pay the bills of a prior client when the rule plainly requires paying Client A's bills using Client A's money and paying Client B's bills using Client B's money.

¶ 38. The OLR says the fact that the thousands of individual clients affected by Attorney Weigel's misconduct were not named at trial does not change the fact that thousands of clients were affected by his misuse of their monies held in trust. The OLR suggests that if the firm, as Attorney Weigel asserts, settled thousands of cases every year and the trust account had a deficit from March 1999 until the date of trial in January 2012, thousands of clients did not have their third-party bills timely paid because their money was diverted to pay the third-party bills of clients ahead of them in the trust account queue.

¶ 39. The OLR says that it did present evidence regarding former client L.B., who signed her settlement statement on June 8, 2006, and received her share of the settlement proceeds. L.B.'s settlement statement said, "I accept the settlement and further authorize the disbursements stated above." The OLR says at that point, from the client's perspective, there was no reason the third-party bills should not have been paid immediately. Instead, the OLR says, to the extent payments made on L.B.'s behalf can be traced, bills were not paid

until eight months after the settlement and in the meantime the third-party creditors that should have been paid in June of 2006 continued to hound L.B. for payment.

¶ 40.   The OLR argues that based on the partial stipulation and Attorney Weigel's admissions, ample evidence supports the referee's conclusion that, as alleged in Count One, Attorney Weigel systematically violated former SCR 20:1.15(d)(1) and SCR 20:8.4(c) by failing to promptly disburse settlement proceeds of clients such as L.B. to third-party payees such as MOMS.

¶ 41.   The OLR says the same analysis applies to Attorney Weigel's attack on the referee's conclusion that he converted client funds. The OLR says in denying that the findings established he converted any client funds, Attorney Weigel confuses conversion with misappropriation. The OLR notes conversion has been described as:

> [T]he unauthorized use of a client's funds for the lawyer's own purpose. It includes temporary use, and it extends to use that does not result in personal gain or benefit to the lawyer. Paying one client out of money due another, keeping an unearned advance fee, holding on to unused escrow funds, and applying client funds to the client's bill are all examples of conversion.

ABA/BNA Lawyers' Manual on Professional Conduct § 45:503 (2007) (emphasis added; citations omitted).

¶ 42.   In its cross-appeal, the OLR argues that this court should revoke Attorney Weigel's license rather than impose the 30–month suspension recommended by the referee. It argues revocation is necessary and appropriate to protect the public and the legal profession. It says Attorney Weigel systematically converted

34

millions of dollars of client funds over a period of more than ten years and in doing so, and in lying to the OLR in an effort to conceal his improper trust account practices, he engaged in dishonesty, fraud, deceit, and misrepresentation.

¶ 43. The OLR argues revocation is the only appropriate sanction and anything less would undermine the public's faith in the honesty and integrity of the bar. It says this is not a "no harm" case, and it argues actual harm was done to clients when their money was used without their consent for purposes unrelated to their cases. Because of the lack of records, the OLR says Attorney Weigel has not even established the absence of monetary harm, as opposed to other types of harm. The OLR says:

> An attorney who intentionally refuses to comply with the recordkeeping requirements of SCR 20:1.15 and who believes himself entitled to unilaterally use client money without the clients' consent, and even worse without accounting for the use of their money— and who does so for over ten years and with tens of millions of client dollars—does untold harm to the reputation of the legal system and to the court responsible for oversight of the system and enforcement of the rules of professional responsibility.

¶ 44. A referee's findings of fact will not be set aside unless clearly erroneous. Conclusions of law are reviewed de novo. *See In re Disciplinary Proceedings Against Eisenberg,* 2004 WI 14, ¶ 5, 269 Wis. 2d 43, 675 N.W.2d 747. This court is free to impose whatever discipline it deems appropriate, regardless of the referee's recommendation. *See In re Disciplinary Proceedings Against Widule,* 2003 WI 34, ¶ 44, 261 Wis. 2d 45, 660 N.W.2d 686.

35

¶ 45. Attorney Weigel argues that the OLR improperly shifted the burden of proof to him on its allegations that he converted client or third-party funds. While Attorney Weigel concedes that his inability to produce the trust account records required by the rules of professional responsibility is a violation of supreme court rules, he argues the failure to maintain and produce the records required by the rules does not equate to a finding that he converted client or third-party funds. He argues the OLR has the burden to prove conversion and he asserts the mere fact he cannot produce records does not prove conversion. We disagree.

¶ 46. The Comment to SCR 20:1.15 provides, "A lawyer must hold the property of others with the care required of a professional fiduciary." In *In re Trust Estate of Martin,* 39 Wis. 2d 437, 159 N.W.2d 660 (1968), we explained:

> A trustee is not handling his own funds but funds of others and he must always be able to make a full accounting of his stewardship. When a trustee's accounts are not clear and accurate, all presumptions are against him and the obscurities and doubts are to be taken adversely against him.

*Id.* at 441–42.

¶ 47. Although *Martin* did not involve an attorney's trust account, we find the same rationale applies in the attorney regulatory context. In this regard, we find instructive the South Carolina Supreme Court's holding in *Matter of Miles,* 516 S.E.2d 661 (1999): "When disciplinary counsel presents clear and convincing evidence of trust account violations or other

inadequate recordkeeping, a lawyer's records must be sufficiently detailed to overcome the allegations." *Id.* at 663.

¶ 48.   Attorney Weigel admits that he failed to keep the records required by SCR 20:1.15. He also admits that he failed to promptly deliver funds to third parties and that he routinely advanced money rightly belonging to one client to pay funds owed to different clients. The record clearly supports the referee's findings of fact that the OLR met its burden of proof on all of the counts in its complaint, including Counts One and Seven.

¶ 49.   Turning to the appropriate sanction, although most cases involving trust account violations that have resulted in revocation of an attorney's license to practice law have involved the attorney misappropriating funds to his or her own use, *see, e.g., In re Disciplinary Proceedings Against Stange,* 2012 WI 66, 341 Wis. 2d 642, 815 N.W.2d 384, the scope of the trust account deficit in this case and the length of time it has continued requires a very strong sanction. From 1999 until the present, Attorney Weigel systematically robbed Peter to pay Paul, paying clients out of money due to other clients, not distributing funds in a timely fashion to third-party medical providers and others, instead paying the "squeakiest wheel." Attorney Weigel admitted using both personal and firm funds to try to cover the trust account deficit and he admitted doing so on a regular basis since taking control of the firm in March of 1999.

¶ 50.   Attorney Weigel admits that when he purchased the firm from Alvin Eisenberg, he was aware the trust account was running a deficit which he believed to be in the $200,000 to $250,000 range. He admits that by

late 1999 or early 2000 he recognized the trust account deficit was closer to $1,000,000. Yet, he did not report the problem to the OLR, nor did he close the terribly out of balance trust account and open a new one.[17] It was apparently the culture of the law firm, both when Alvin Eisenberg was in charge and after Attorney Weigel took over, not to keep the requisite trust account records. Attorney Weigel argues that his motives were selfless, that he tried to remedy the situation by gradually paying off the trust account deficit he inherited, thereby saving the jobs of the many people who worked at the law firm, and that he would have made more money if he had simply walked away from the firm. We concur, however, with the referee that profit motives as well as selfish motives led to Attorney Weigel's decision to try to hide the trust account problems for many years rather than acknowledging the problems and dealing with them in an appropriate fashion.

¶ 51. We reject Attorney Weigel's claim that the OLR failed to prove that anyone was harmed by the trust account violations. L.B. was required to pay healthcare bills out of her own money that she thought had been paid by the firm. MOMS failed to receive timely payments. Attorney Weigel admitted that third parties routinely had to wait for months to get paid. By

[17] SCR 20:8.3(a) provides, "A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority." Attorney Weigel had no qualms about reporting Alvin Eisenberg to the OLR for other, relatively minor squabbles arising out of the dissolution of their partnership. It is inconceivable that he would choose not to report a million dollar trust account deficit to the OLR.

Attorney Weigel's own admission, his law firm's trust account has run a deficit of between $100,000 and $1,000,000 for over 13 years. This is not a case where an attorney's failure to strictly comply with the record-keeping requirements of the trust account rule amounts to nothing more than a technical violation.

■

¶ 52.  A six- or seven-figure deficit in an account that holds client funds is an ethical failure of epic proportions. We agree with the OLR that it would be difficult to imagine a more aggravated pattern of misconduct than the one presented here. We agree with the OLR that any sanction less than revocation would undermine the public's confidence in the honesty and integrity of the bar. Revocation of Attorney Weigel's license is the only sanction proportionate to the seriousness of the misconduct, and revocation will also protect the public, the courts, and the legal system, and it will deter other lawyers from engaging in similar misconduct. We also agree with the referee that Attorney Weigel should be assessed the full costs of the proceeding.[18]

---

[18] Attorney Weigel has filed an objection to the OLR's statement of costs, saying this court should disallow the costs submitted by the OLR because they were unnecessary, excessive, and the OLR over-litigated the case from start to finish. Supreme court rule 22.24(1m) provides that the court's general policy is that upon a finding of misconduct it is appropriate to impose all costs upon the respondent. In cases involving extraordinary circumstances the court may, in the exercise of its discretion, reduce the amount of costs. We find no extraordinary circumstances in this case that would warrant a deviation from the court's general policy.

Attorney Weigel has also filed two motions to compel production of materials he claims are relevant to his objections

¶ 53.   Finally, we address the referee's recommen-
dation that this court consider entering an order deal-
ing with the current trust account problems and requir-
ing Attorney Weigel to pay restitution in the form of
being responsible for all current trust account deficits.
In order to deal with the remaining trust account
deficits, we deem it appropriate to order Attorney
Weigel to freeze any existing trust accounts and open a
new one. We also find it appropriate to order that in the
event any shortfalls should be found to exist in the old
trust account or accounts, Attorney Weigel must reim-
burse the amount of the shortfall. He should be entitled
to seek contribution, to the extent permitted by law,
from any other individuals he believes should be re-
quired to contribute.

¶ 54.   IT IS ORDERED that the license of Joseph
W. Weigel to practice law in Wisconsin is revoked,
effective February 1, 2013.

¶ 55.   IT IS FURTHER ORDERED that within 30
days of the date of this order, Joseph W. Weigel shall
freeze any existing trust accounts and shall not deposit
any additional funds into them. In addition, he shall see
to it that the firm opens a single new client trust

---

to claimed costs. We deny both motions. While the first motion
alleges that OLR failed to provide sufficient information or
materials to allow Attorney Weigel to assess the veracity of the
claimed costs, the second motion asserts "it is likely that the
information and materials OLR is refusing to produce will lead
to newly discovered evidence that may warrant a new hearing."
In deciding this matter this court has had the benefit of a
referee's report issued after the evidentiary hearing, briefs filed
by the parties, and oral argument. Rather than challenging
costs, it appears Attorney Weigel would like to re-litigate the
case. We decline his request.

account. All subsequent funds received by the firm that are required to be placed in trust shall be deposited only into the new trust account, and recordkeeping for the new account shall strictly comply with all pertinent supreme court rules. In the event any shortfalls are found to exist in the old trust account or accounts, Attorney Weigel is ordered to reimburse the amount of the shortfall. Attorney Weigel may seek contribution, to the extent permitted by law, from any other individuals who he believes should make contribution. Any shortfall in the old trust account or accounts shall be remedied within 90 days of the date of this order.

¶ 56.   IT IS FURTHER ORDERED that within 60 days of the date of this order, Joseph W. Weigel shall pay to the Office of Lawyer Regulation the costs of this proceeding.

¶ 57.   IT IS FURTHER ORDERED that Joseph W. Weigel comply with the provisions of SCR 22.26 concerning the duties of an attorney whose license to practice law has been revoked.

■■■■■■■