# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP659-D |

| | |
|---|---|
| COMPLETE TITLE: | In the Matter of Disciplinary Proceedings Against Robert C. Menard, Attorney at Law:<br><br>Office of Lawyer Regulation,<br>      Complainant-Respondent,<br>   v.<br>Robert C. Menard,<br>      Respondent-Appellant. |

DISCIPLINARY PROCEEDINGS AGAINST MENARD

| | |
|---|---|
| OPINION FILED: | May 29, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | |
|   COUNTY: | |
|   JUDGE: | |

| | |
|---|---|
| JUSTICES: | |
| Per Curiam | |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the respondent-appellant, there were briefs filed by *Terry E. Johnson, Ryan P. Fetherston*, and *von Briesen & Roper, S.C.*, Milwaukee.

For the complainant-respondent, there was a brief filed by *John T. Payette* and the *Office of Lawyer Regulation*, Madison.

**2020 WI 50**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2018AP659-D

STATE OF WISCONSIN      :      IN SUPREME COURT

**In the Matter of Disciplinary Proceedings
Against Robert C. Menard, Attorney at Law:**

**Office of Lawyer Regulation,**

      **Complainant-Respondent,**

  **v.**

**Robert C. Menard,**

      **Respondent-Appellant.**

**FILED**

**MAY 29, 2020**

Sheila T. Reiff
Clerk of Supreme Court

ATTORNEY disciplinary proceeding. *Attorney's license revoked.*

¶1 PER CURIAM. Attorney Robert C. Menard has appealed a referee's recommendation that his license to practice law in Wisconsin be revoked; that he be ordered to make restitution to a number of clients; and that he be ordered to pay the full costs of this proceeding, which are $18,191.42 as of October 25, 2019. Attorney Menard stipulated to 30 counts of misconduct and the only disputed issue left for the referee to decide was the appropriate sanction. Similarly, the only issue raised on appeal is what is reasonable and appropriate discipline for the misconduct in this

case. We agree with the referee that revocation is the appropriate sanction.

¶2 Attorney Menard was admitted to practice law in Wisconsin in 1991. He has no prior disciplinary history. On March 20, 2020, the court, on its own motion pursuant to Supreme Court Rule (SCR) 22.21(1), determined that Attorney Menard's continued practice of law posed a threat to the interests of the public and the administration of justice, and it temporarily suspended his license.

¶3 On April 9, 2018, the Office of Lawyer Regulation (OLR) filed a complaint against Attorney Menard alleging 23 counts of misconduct arising out of 12 client matters. The complaint also alleged various counts of misconduct regarding commingling of funds, conducting prohibited bank transactions, various trust account violations, and making misrepresentations to the OLR. Referee James W. Mohr, Jr. was appointed on May 7, 2018. Attorney Menard filed an answer to the complaint on May 18, 2018.

¶4 On December 28, 2018, the OLR filed an amended complaint adding eight counts of misconduct. The amended complaint added three counts of misconduct involving one of the client matters set forth in the original complaint. It also added five counts of misconduct involving a client matter that was not part of the original complaint. Attorney Menard filed an answer to the amended complaint on January 18, 2019.

¶5 Attorney Menard eventually chose to admit the factual basis of counts 1 through 30 in the OLR's amended complaint, and the OLR agreed to dismiss count 31 with prejudice. A hearing on

2

sanction was held before the referee on August 19 and 20, 2019. At that time, the parties stipulated that the factual allegations in the amended complaint constituted a sufficient factual basis in the record for the referee to conclude that the misconduct alleged in counts 1 through 30 of the amended complaint had taken place.

¶6 The referee issued his report on October 10, 2019. He found that the OLR's uncontested motion for summary judgment and the stipulation put on the record at the evidentiary hearing supported the finding that the OLR had proven all 30 counts of misconduct by clear, satisfactory, and convincing evidence. The following factual recitation is taken from the amended complaint.

¶7 At all times material to the allegations in the amended complaint, Attorney Menard was a member of the firm Derzon & Menard, S.C. (More recently, he practiced with Menard & Menard.) He handled primarily worker's compensation and personal injury matters. Between August 2011 and September 2014, the firm maintained both a trust account and a business account at Park Bank. Between January 2014 and February 2016 the firm maintained both a trust account and a business account at U.S. Bank. Attorney Menard also maintained two joint savings accounts with his wife at U.S. Bank. He was responsible for trust account recordkeeping for his clients, and his partner, Alan Derzon, was responsible for such functions for his clients. However, Attorney Menard prepared most of the deposit slips and signed most of the transactions for the firm's trust and business accounts.

¶8 The first three counts set forth in the OLR's amended complaint involved Attorney Menard's representation of B.C., a

3

minor, in a personal injury matter. Attorney Menard was appointed guardian ad litem (GAL) for B.C. The circuit court approved a $47,500 minor settlement. As GAL, Attorney Menard was ordered to make a payment to Dean Health Care and was ordered to place money in a federally insured interest bearing account at Park Bank until B.C. reached the age of 18 in April 2014.

¶9 Attorney Menard deposited or directed the deposit of a $47,500 check, payable to the Derzon & Menard S.C. trust account, to the Park Bank trust account. He then transferred the entire settlement from the Park Bank trust account to the Park Bank business account. Those transfers were made by telephone. Immediately before these transfers, the Park Bank business account was overdrawn. The transfers restored the account to a positive balance.

¶10 The amended complaint alleged the following counts of misconduct with respect to B.C.'s case:

**Count 1:** By disbursing and failing to hold in trust $29,105.65 that he received as B.C.'s GAL on February 1, 2013, Attorney Menard violated former SCR 20:1.15(j)(1).[1]

---

[1] Effective July 1, 2016, substantial changes were made to Supreme Court Rule 20:1.15, the "trust account rule." See S. Ct. Order 14-07, 2016 WI 21 (issued Apr. 4, 2016, eff. July 1, 2016). Because the conduct underlying this case arose prior to July 1, 2016, unless otherwise indicated, all references to the supreme court rules will be to those in effect prior to July 1, 2016.

Former SCR 20:1.15(j)(1) provided:

A lawyer shall hold in trust, separate from the lawyer's own funds or property, those funds or that property of clients or 3rd parties that are in the lawyer's possession when acting in a fiduciary capacity

4

**Count 2:** By converting $29,105.65 belonging to B.C. between April 24, 2013 and May 16, 2013 to cover overdrafts on the Park Bank Business Account, Attorney Menard violated SCR 20:8.4(c).[2]

**Count 3:** By failing to place B.C.'s $29,105.65 in a federally insured interest bearing account until B.C. reached the age of 18 on April 2, 2014, Attorney Menard knowingly failed to abide by a court order and violated SCR 20:3.4(c).[3]

¶11 The next four counts of misconduct alleged in the amended complaint arose out of Attorney Menard's representation of C.M. and D.D. Attorney Menard represented C.M. in a personal injury action. In December 2013, Attorney Menard deposited or directed the deposit of a $76,000 check related to C.M.'s claim to the Park Bank trust account. The firm also represented D.D. in a worker's compensation claim and a related civil action. Attorney Menard deposited or directed the deposit of a $90,000 check related to D.D.'s claim to the Park Bank trust account.

¶12 Between December 18, 2013 and February 3, 2014, Attorney Menard transferred $163,500 of the C.M. and D.D. settlements from the Park Bank trust account to the Park Bank business account. Most of the transfers occurred by telephone or internet. On

that directly arises in the course of, or as a result of, a lawyer-client relationship or by appointment of a court.

[2] SCR 20:8.4(c) provides: "It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

[3] SCR 20:3.4(c) provides: "A lawyer shall not knowingly disobey an obligation under the rules of a tribunal, except for an open refusal based on an assertion that no valid obligation exists."

December 20, 2013, the Park Bank business account was overdrawn by more than $15,000. A transfer from the Park Bank trust account briefly restored the business account to a positive balance but soon thereafter the Park Bank business account was again overdrawn. The business account was restored to a positive balance with another transfer from the trust account. This pattern of the business account being overdrawn and then restored to a positive balance by more transfers from the trust account was repeated multiple times.

¶13 The amended complaint alleged the following counts of misconduct with respect to the C.M. and D.D. cases:

**Count 4:** By disbursing and failing to hold in trust $46,919.15 of C.M.'s personal injury settlement between December 18, 2013 and February 3, 2014, Attorney Menard violated SCR 20:1.15(b)(1).[4]

**Count 5:** By converting $46,919.15 of C.M.'s settlement between December 18, 2013 and February 3, 2014 to cover overdrafts on the firm's business account, Attorney Menard violated SCR 20:8.4(c).

**Count 6:** By disbursing and failing to hold in trust as much as $57,500 of D.D.'s settlement between December 23, 2013 and February 3, 2014, Attorney Menard violated SCR 20:1.15(b)(1).

---

[4] SCR 20:1.15(b)(1) provides:

A lawyer shall hold in trust, separate from the lawyer's own property, that property of clients and 3rd parties that is in the lawyer's possession in connection with a representation. All funds of clients and 3rd parties paid to a lawyer or law firm in connection with a representation shall be deposited in one or more identifiable trust accounts.

**Count 7:** By converting as much as $57,500 of D.D.'s settlement between December 23, 2013 and February 3, 2014 to cover overdrafts on the firm's business account, Attorney Menard violated SCR 20:8.4(c).

¶14 The next client matter detailed in the amended complaint involved Attorney Menard's firm's representation of D.S. in a personal injury matter. On November 26, 2012, Attorney Menard deposited or directed the deposit of a $190,000 check relating to the D.S. matter to the Park Bank business account. Between November 26, 2012 and November 30, 2012, Attorney Menard used the D.S. settlement proceeds to cover numerous transactions, including pre-authorized debits to AT&T, Target, CITI Card, and Austin Ford.

¶15 The amended complaint alleged the following count of misconduct with respect to D.S.'s settlement:

**Count 8:** By converting as much as $117,300.02 of D.S.'s settlement between November 26, 2012 and December 18, 2012 to pay business and personal expenses and to make disbursements to himself of $13,500, Attorney Menard violated SCR 20:8.4(c).

¶16 The next client matter detailed in the amended complaint involved Attorney Menard's representation of B.H. in a personal injury matter. On December 3, 2012, Attorney Menard deposited or directed the deposit of a $93,893.53 check to the firm's Park Bank business account. By December 18, 2012, the Park Bank business account was overdrawn; none of the settlement proceeds had been paid to B.H.; and Attorney Menard had converted as much as $67,072.82 of the settlement. Attorney Menard eventually disbursed a total of $52,950 to B.H. despite the fact that the settlement breakdown specified that she was owed $62,950.32.

7

Attorney Menard has provided no evidence that B.H. received the remaining $10,000 of her settlement funds.

¶17 The OLR's amended complaint alleged the following count of misconduct with respect to Attorney Menard's handling of the B.H. settlement:

**Count 9:** By converting as much as $67,072.82 of B.H.'s settlement between December 3, 2012 and December 18, 2012 in order to cover disbursements unrelated to his representation of B.H., Attorney Menard violated SCR 20:8.4(c).

¶18 The next client matter detailed in the amended complaint involved Attorney Menard's representation of M.B. in a worker's compensation claim. On December 19, 2012, Attorney Menard deposited or directed the deposit of a $63,491.97 check to the Park Bank business account. Another check payable to an attorney at Derzon & Menard was deposited the same day. Prior to those deposits, the Park Bank business account was overdrawn. The deposited funds were used to cover checks to Attorney Menard and wire transfers to other individuals. In addition, Attorney Menard disbursed four checks payable to "cash" totaling $16,000 from the funds. The amended complaint alleged the following count of misconduct with respect to the M.B. matter:

**Count 10:** By converting as much as $63,491.97 of M.B.'s settlement between December 19, 2012 and January 4, 2013 in order to repay $42,259.46 that was owed to D.S. and make $11,000 in disbursements and wire transfers to Attorney Menard and others, as well as $16,000 in cash disbursements, Attorney Menard violated SCR 20:8.4(c).

¶19 The next client matter detailed in the amended complaint involved Attorney Menard's representation of J.B. regarding an

8

auto accident. On April 15, 2013, Attorney Menard deposited or directed the deposit of a $92,330 check to the Park Bank business account along with two other checks. Prior to this deposit, the business account was overdrawn. The deposit restored the account to a positive balance. Between April 15 and April 22, 2013, Attorney Menard made numerous disbursements from the Park Bank business account, including a $28,300 cashier's check to his wife.

¶20 At the close of business on April 22, 2013, the business account was overdrawn by $244.19; none of the funds had been disbursed to J.B. and Attorney Menard had converted as much as $55,648.44 relating to the J.B. matter. Attorney Menard continues to owe J.B., or her subrogated care providers, $12,648.44.

¶21 The amended complaint alleged the following count of misconduct with respect to Attorney Menard's representation of J.B.:

> **Count 11:** By converting as much as $55,648.44 of J.B.'s settlement between April 15, 2013 and April 22, 2013 in order to repay $27,500 to D.S., provide a $28,300 cashier's check to his wife, and cover numerous business or personal expenses, Attorney Menard violated SCR 20:8.4(c).

¶22 The next client matter detailed in the amended complaint involved Attorney Menard's representation of J.L.-M. in a personal injury action and a related third-party worker's compensation claim. The settlement in the matter was paid via two checks issued to the Derzon & Menard trust account: a $108,000 check dated May 13, 2013, and a $12,000 check dated June 3, 2013. On June 3, 2013, Attorney Menard deposited or directed the deposit of the $108,000 check to the Park Bank business account. Prior to this deposit

9

the account was overdrawn by over $12,000. Between June 3 and June 17, 2013, Attorney Menard made numerous disbursements from the business account for business and personal expenses. By June 17, 2013, the business account was overdrawn by $2,757.59 and no disbursements had been made to J.L.-M. Attorney Menard told J.L.-M. he had made disbursements in accordance with the settlement breakdown.

¶23 Specifically, Attorney Menard told J.L.-M. he had disbursed $12,491.77 to Athletic & Therapeutic Institute and $7,623.75 to Blount Orthopedic Clinic. Park Bank records show that neither check was ever presented for payment or cleared the business account.

¶24 In January 2014, against Attorney Menard's advice, J.L.-M. and her husband claimed all of her medical expenses as deductions on their 2013 joint income tax return. An IRS audit ensued in 2016.

¶25 J.L.-M. and her husband hired the law firm of Robinson & Henry, P.C., to represent them in the tax audit. Thereafter, both J.L.-M. and her new attorneys repeatedly requested medical billing information and documentation from Attorney Menard. While Attorney Menard was initially helpful in providing documents, he later became difficult to reach and never sent them all of the correct documents showing proof of medical payments he had made on J.L.-M.'s behalf.

¶26 Ultimately, the IRS did not allow the payments to Blount Orthopedic Clinic and Athletic & Therapeutic Institute to be included in its calculations because there was no proof those

medical expenses had been paid out of J.L.-M.'s settlement. J.L.-M. and her husband eventually settled with the IRS for an additional tax burden of $3,973, plus interest on their 2013 tax return.

¶27 On November 26, 2013, Attorney Menard issued a check from his Park Bank business account payable to Blount Orthopedic Clinic in the amount of $3,000, which was presented and paid in December 2013. Attorney Menard acknowledged to the OLR that this check was paid on behalf of J.L.-M. to settle the debt she owed to Blount Orthopedic Clinic.

¶28 On July 24, 2014, Attorney Menard issued a check from his U.S. Bank business account payable to Athletic & Therapeutic Institute in the amount of $8,000, which was presented and paid on August 20, 2014. Attorney Menard acknowledged to the OLR that this check was paid on behalf of J.L.-M. to settle the debt owed to Athletic & Therapeutic Institute.

¶29 Attorney Menard never advised either J.L.-M. or Robinson & Henry of these reduced payments, despite their repeated requests during the IRS audit for evidence of all medical payments made. Until July 2018, Attorney Menard had led J.L.-M. to believe that the full bills of both of those creditors had been paid. To date, Attorney Menard has not made any refund to J.L.-M., either the $4,623.75 balance of any funds after the $3,000 payment to Blunt Orthopedic Clinic or the $4,491.77 balance of funds after the $8,000 payment to Athletic & Therapeutic Institute.

¶30 The amended complaint alleged the following counts of misconduct with respect to Attorney Menard's handling of the J.L.-M. case:

**Count 12:** By converting as much as $78,727.28 of J.L.-M.'s settlement between June 3, 2013 and June 17, 2013 to cover numerous business or personal expenses, including $384 in overdraft fees; a $10,000 check to his mother; a $5,000 check to Entercom for advertising; checks to other clients and checks to "Cash," Attorney Menard, or Derzon & Menard totaling $10,400, Attorney Menard violated SCR 20:8.4(c).

**Count 13:** By falsely informing J.L.-M. that he had paid Athletic & Therapeutic Institute $12,491.77 and Blunt Orthopedic Clinic $7,623.75 on her behalf from the settlement proceeds in her case, Attorney Menard violated SCR 20:8.4(c).

**Count 14:** By failing to promptly deliver $12,491.77 to Athletic & Therapeutic Institute and $7,623.75 to Blount Orthopedic Clinic pursuant to the Settlement Agreement, or to promptly disburse the balance ($9,115.52) of any remaining funds to J.L.-M. after settling the claims of Athletic & Therapeutic Institute and Blount Orthopedic Clinic for lesser amounts, Attorney Menard violated SCR 20:1.15(e)(1).[5]

**Count 15:** By failing to fully and accurately respond to J.L.-M.'s request for information regarding the disbursement of her settlement funds to her creditors, including his failure to inform J.L.-M. that he had paid

---

[5] SCR 20:1.15(e)(1) provides:

Upon receiving funds or other property in which a client has an interest, or in which a lawyer has received notice that a 3rd party has an interest identified by a lien, court order, judgment, or contract, the lawyer shall promptly notify the client or 3rd party in writing. Except as stated in this rule or otherwise permitted by law or by agreement with the client, the lawyer shall promptly deliver to the client or 3rd party any funds or other property that the client or 3rd party is entitled to receive.

12

only $8,000 to Athletic & Therapeutic Institute and $3,000 to Blount Orthopedic Clinic and that she was entitled to a refund totaling $9,115.52, Attorney Menard violated SCR 20:1.4(a)(4).[6]

¶31 The next client matter detailed in the amended complaint involved Attorney Menard's representation of P.D. in a personal injury case. Attorney Menard's records include a copy of a $50,000 check payable to the firm's client trust account in the P.D. matter, but Attorney Menard has not identified the account into which the $50,000 was deposited and has not identified any disbursements made to P.D. from those funds.

¶32 On March 13, 2014, Attorney Menard deposited or directed the deposit of a $75,000 check relating to the P.D. matter to the firm's U.S. Bank business account.

¶33 Between March 13 and March 26, 2014, Attorney Menard made numerous disbursements from the U.S. Bank business account, including over $40,000 for advertising and payments to Attorney Menard, his law firm, or cash. Attorney Menard also disbursed two checks totaling $23,000 to another client whose personal injury case had been settled in December of 2013. No funds belonging to that client were ever deposited to the U.S. Bank business account.

¶34 The amended complaint alleged the following count of misconduct with respect to Attorney Menard's representation of P.D.:

> **Count 16:** By converting as much as $74,313.81 of P.D.'s two settlements between approximately July 31, 2012 and May 22, 2014, at least some of which was used to cover

---

[6] SCR 20:1.4(a)(4) provides: "A lawyer shall promptly comply with reasonable requests by the client for information."

business expenses, including advertising and payments to Attorney Menard, the firm, and "Cash," Attorney Menard violated SCR 20:8.4(c).

¶35 The next client matter detailed in the amended client involved Attorney Menard's representation of T.R. in a worker's compensation matter. On February 4, 2015, Attorney Menard deposited or directed the deposit of two checks to the U.S. Bank business account in the T.R. case: a $55,289.57 check payable to T.R., which was not endorsed, and a $14,710.43 check payable to Attorney Menard. Prior to that deposit, the balance in the U.S. Bank business account was $8,259.25. That same day, there were two electronic withdrawals from the U.S. Bank business account by YP Advertising. On February 6, 2015, a check for over $28,000 payable to the Wisconsin Department of Revenue cleared the U.S. Bank business account. By February 9, 2015, the business account was overdrawn by $16.30, and none of T.R.'s funds remained in the account.

¶36 The amended complaint alleged the following count of misconduct with respect to Attorney Menard's representation of T.R.:

**Count 17:** By converting T.R.'s $55,289.57 worker's compensation settlement between February 4, 2015 and February 9, 2015 to cover business expenses, including advertising and a payment to the Wisconsin Department of Revenue, Attorney Menard violated SCR 20:8.4(c).

¶37 The next client matter detailed in the amended complaint arose out of Attorney Menard's representation of J.S. in a worker's compensation matter. On December 21, 2015, Attorney Menard deposited or directed the deposit of a $31,326.31 check to the

14

U.S. Bank business account. That amount represented Attorney Menard's fees and costs in the matter. On December 31, 2015, Attorney Menard deposited or directed the deposit of a $95,637.56 check payable to J.S. to the business account. Prior to this deposit, there was $9,119.39 in the business account.

¶38 Between December 31, 2015 and January 6, 2016, over $140,000 in transactions cleared the U.S. Bank business account, including payments to the Milwaukee Athletic Club, Bank of America, Chase, and GM Financial.

¶39 On January 6, 2016, Attorney Menard transferred $15,000 of J.S.'s funds from the U.S. Bank trust account to the U.S. Bank business account. By the close of business that day, the business account was overdrawn and none of J.S.'s funds had been disbursed to her.

¶40 Between January 7 and February 9, 2016, Attorney Menard transferred $73,000 belonging in part to J.S. from the U.S. Bank trust account to the U.S. Bank business account. None of those transfers were used to pay J.S. The funds were all used for business and personal purposes.

¶41 The amended complaint alleged the following count of misconduct with respect to Attorney Menard's representation of J.S.:

**Count 18:** By converting J.S.'s $95,637.56 worker's compensation settlement to cover business expenses, including advertising, a $35,843.08 payment to ADP relating to a 401k plan and a $25,500 check to his new law firm, Attorney Menard violated SCR 20:8.4(c).

15

¶42 The next client matter detailed in the amended complaint involved Attorney Menard's representation of P.M., who is Attorney Menard's uncle. P.M. has a winter home in Florida. In February of 2014, he was struck by a car while he was mowing his lawn at his home in Florida and suffered severe injuries requiring medical and surgical treatment.

¶43 On April 10, 2014, P.M. hired Attorney Menard to represent him in a personal injury action against the driver who hit him. The parties entered into a contingent fee agreement which provided that P.M. agreed to pay Derzon & Menard 33 1/3 percent of whatever total sum was collected, plus costs and disbursements.

¶44 The driver had $1,000,000 in liability coverage through State Farm. P.M. denies that Attorney Menard informed him about the policy limit. Attorney Menard said he was concerned about potential contributory negligence since there were reports that P.M. had stepped into the road in front of the car while mowing his lawn. P.M. had no recollection of the accident and would not be able to testify to rebut those reports.

¶45 In June 2014, State Farm offered to settle the case for $325,000. P.M. agreed Attorney Menard should attempt to negotiate a higher settlement and, if there was not a higher offer, the initial offer would be accepted. Attorney Menard negotiated a higher settlement figure of $500,000. P.M. accepted that settlement amount.

¶46 On July 3, 2014, State Farm issued a $500,000 check payable to Derzon & Menard Attorneys at Law Trust Account and mailed it to Attorney Menard. The check was deposited in Derzon

& Menard's business account at U.S. Bank on July 8, 2014. Attorney Menard did not inform P.M. of the receipt of the funds. He did not disburse any portion of the settlement payment to P.M. or to any third party on P.M.'s behalf.

¶47  On July 9, 2014, P.M. signed a release agreeing to the $500,000 settlement. Between July 8 and July 28, 2014, Attorney Menard made numerous disbursements from the U.S. Bank business account for business and personal expenses unrelated to his representation of P.M. By October 17, 2014, following numerous deposits and disbursements unrelated to P.M.'s case, the balance in the U.S. Bank business account was $131.93. By November 24, 2014, the balance of the business account was $16.96. Thus, by November 24, 2014, Attorney Menard had converted $333,333.33 of P.M.'s settlement funds.

¶48  From April 2015 through early 2018, P.M. repeatedly contacted Attorney Menard by telephone and email inquiring about the status of his settlement proceeds. Attorney Menard gave excuses to P.M. as to why he was not able to disburse the funds.

¶49  P.M.'s own insurance agreed to cover his medical expenses. P.M.'s insurance carrier paid out $648,478.14 to medical care providers on P.M.'s behalf, discharging most of the medical bills for less than the original amount billed, which was $1,993,103.10.

¶50  Attorney Menard did not disburse any portion of the $500,000 settlement as payment for any of P.M.'s medical bills.

¶51  In early 2018, P.M. hired Attorneys Lenz and Meadows as successor counsel. In July 2018, P.M. sued Attorney Menard, his

17

former firm, his current firm, and others to recover the settlement proceeds to which he was entitled. The case settled following meditation. The settlement is confidential.

¶52 The amended complaint alleged the following counts of misconduct with respect to Attorney Menard's representation of P.M.:

> **Count 19:** By depositing or directing the July 8, 2014 deposit of a check in the amount of $500,000 in personal injury settlement proceeds for P.M. to his firm's U.S. Bank Business Account, rather than into the firm's trust account, Attorney Menard violated SCR 20:1.15(b)(1).
>
> **Count 20:** By failing to disburse settlement funds to P.M., Attorney Menard violated former SCR 20:1.15(d)(1)[7] and current SCR 20:1.15(e)(1).
>
> **Count 21:** By converting funds from P.M.'s State Farm settlement between July 8, 2014 and November 24, 2014, Attorney Menard violated SCR 20:8.4(c).
>
> **Count 22:** By failing to fully and accurately respond to P.M.'s request for reports on the status of his settlement funds, Attorney Menard violated SCR 20:1.4(a)(4).
>
> **Count 23:** By failing to provide P.M. with a full accounting of his settlement funds upon their final

---

[7] Former SCR 20:1.15(d)(1) provided:

> Upon receiving funds or other property in which a client has an interest, or in which the lawyer has received notice that a 3rd party has an interest identified by a lien, court order, judgment, or contract, the lawyer shall promptly notify the client or 3rd party in writing. Except as stated in this rule or otherwise permitted by law or by agreement with the client, the lawyer shall promptly deliver to the client or 3rd party any funds or other property that the client or 3rd party is entitled to receive.

18

distribution, Attorney Menard violated former SCR 20:1.15(d)(2), and current SCR 20:1.15(e)2.[8]

¶53 The amended complaint alleges two counts of misconduct for commingling funds. It alleges that between December 2012 and February 2014, Attorney Menard deposited or directed the deposit of at least 72 checks to the Park Bank business account that were payable to the firm's trust account, to a specific client, to the firm and a specific client or a third party. Those deposits totaled $1,801,858.13.

¶54 Between March 2014 and September 2016, Attorney Menard deposited or directed the deposit of at least 102 checks to the U.S. Bank business account that were payable to the firm's trust account, to a specific client, to the firm and a specific client or a third party. Those 103 deposits total $2,806,497.51.

¶55 Attorney Menard admitted under oath in an interview conducted by the OLR that the checks deposited to the Park Bank business account were more likely than not all attorney fee checks from worker's compensation cases. He also admitted under oath he did not keep track of whose funds were deposited to the business account and that he would use funds in that account for his own purposes.

¶56 The amended complaint alleged the following counts of misconduct with respect to Attorney Menard's commingling of funds:

---

[8] SCR 20:1.15(d)(2) was renumbered as SCR 20:1.15(e)(2). The text of the rule was not changed and provides: "Upon final distribution of any trust property or upon request by the client or a 3rd party having an ownership interest in the property, the lawyer shall promptly render a full written accounting regarding the property."

**Count 24:** By depositing or directing the deposit of as many as 72 checks totaling $1,801,858.13 to the Park Bank Business Account between December 2012 and February 2014, which checks were payable to the firm's trust account, specific clients, the firm and a specific client, or a third party, Attorney Menard violated SCR 20:1.15(b)(1).

**Count 25:** By depositing or directing the deposit of as many as 103 checks totaling $2,806,497.51 to the U.S. Bank Business Account between March 2014 and September 2016, which checks were payable to the firm's trust account, to specific clients, the firm and a specific client, a third party, or which otherwise constituted trust property, Attorney Menard violated SCR 20:1.15(b)(1).

**Count 26:** By conducting 46 telephone and internet transactions in his trust accounts at Park Bank and U.S. Bank between January 1, 2013 and February 16, 2016, Attorney Menard violated former SCR 20:1.15(e)(4)b. and c.[9]

¶57 Finally, the amended complaint alleged additional trust account violations as follows:

**Count 27:** By failing to preserve transaction registers and client ledgers for at least six years after the

---

[9] Former SCR 20:1.15(e)(4)b. and c. provided:

b. No deposits or disbursements shall be made to or from a pooled trust account by a telephone transfer of funds. This section does not prohibit any of the following:

1. wire transfers.

2. telephone transfers between non-pooled draft and non-pooled non-draft trust accounts that a lawyer maintains for a particular client.

c. A lawyer shall not make deposits to or disbursements from a trust account by way of an Internet transaction.

20

termination of representation, Attorney Menard violated former SCR 20:1.15(e)(6).[10]

**Count 28:** By failing to produce transaction registers and client ledgers for funds received in trust, despite requests by the OLR on July 5, 2017, July 26, 2017, and July 31, 2017, Attorney Menard violated SCR 20:1.15(g)(2).[11]

**Count 29:** By maintaining trust account records by computer between at least December 1, 2012 and December 31, 2015, and failing to regularly back up those records, Attorney Menard violated former SCR 20:1.15(f)(4)a.[12]

**Count 30:** By failing to print a copy of the transaction register and client ledgers for the Derzon & Menard Trust

---

[10] Former SCR 20:1.15(e)(6) provided: "A lawyer shall maintain complete records of trust account funds and other trust property and shall preserve those records for at least 6 years after the date of termination of the representation."

[11] SCR 20:1.15(g)(2) provides:

All trust account records have public aspects related to a lawyer's fitness to practice. Upon request of the office of lawyer regulation, or upon direction of the supreme court, the records shall be submitted to the office of lawyer regulation for its inspection, audit, use, and evidence under any conditions to protect the privilege of clients that the court may provide. The records, or an audit of the records, shall be produced at any disciplinary proceeding involving the lawyer, whenever material.

[12] Former SCR 20:1.15(f)(4)a. provided: "A lawyer who maintains trust account records by computer shall maintain the transaction register, client ledgers, and reconciliation reports in a form that can be reproduced to printed hard copy. Electronic records must be regularly backed up by an appropriate storage device."

Account every 30 days, Attorney Menard violated former
SCR 20:1.15(f)(4)b.[13]

¶58 In his report, the referee noted that a number of witnesses testified at the hearing and, in the referee's opinion, the most convincing witness was Mary Hoeft Smith, the former Trust Account Program Administrator for the OLR, who is now retired. Ms. Smith testified that Attorney Menard was unable to produce the required trust account records, but he did produce voluminous business account records. She testified it was a common practice for him to move client trust funds into his business account and then use those funds to pay "very hefty expenses for things like advertising, radio, and billboards." She described this as a practice of "robbing Peter to pay Paul" and using funds belonging to one client in order to pay back a client who was previously the victim of a conversion by Attorney Menard. She testified that the matters that were charged in this case were only the largest of many, many conversions and in her opinion "virtually every client whose funds went into the business account were converted."

¶59 The referee noted that J.L.-M. testified by telephone from Colorado and the referee found her to be intelligent, honest, and straightforward. J.L.-M. testified she felt a lot of betrayal from Attorney Menard and that it had been a very harrowing experience.

---

[13] Former SCR 20:1.15(f)(4)b. provided: "In additional to the requirements of sub. (f)(4)a., the transaction register, the subsidiary ledger, and the reconciliation report shall be printed every 30 days for the IOLTA account. The printed copy shall be retained for at least 6 years, as required under sub. (e)(6)."

¶60 The referee noted that P.M., Attorney Menard's 71-year-old uncle, also testified and although the matter has been resolved and P.M. has no further claim for restitution, the entire experience has left a bad taste in P.M.'s mouth.

¶61 The referee found that Attorney Menard "gave the impression of not being entirely trustworthy." The referee said Attorney Menard felt he was entitled to the full $500,000 settlement proceeds from his uncle's settlement and that his uncle was entitled to nothing. The referee said "this assertion lacked a rational basis and was a rather cold-hearted way to treat a family member. It showed a distinct lack of remorse on Respondent's part in depriving his uncle of his settlement proceeds."

¶62 The referee also noted that Attorney Menard claimed that each of his clients gave him a power of attorney to do whatever he wanted with their money and that included depositing the money into the business account and using it for whatever purposes Attorney Menard wanted. The referee said:

> Frankly, I found it astonishing that an attorney would ask clients to sign a power of attorney allowing him to use their settlement money for the attorney's business purposes, and also apparently thought this practice would absolve him of the Supreme Court's trust account requirements. Interestingly, Respondent never produced any of those powers of attorney as exhibits at the hearing. (Emphasis added.)

¶63 The referee said Attorney Menard acknowledged that he was sloppy and "crappy" in regards to his accounting practices but

said "a revocation would ruin me and would ruin everything that I've worked for 30 years."

¶64 The referee said that the evidence revealed that over at least a six-year period, Attorney Menard converted over $1,000,000 in client funds. The referee said additionally, between December 2012 and September 2016, Attorney Menard deposited as many as 175 checks made out to clients, to his trust account, or to third parties, all of which should have gone into the trust account, into his business accounts and these out-of-trust deposits at two different banks totaled over $4,000,000.

¶65 After considering a variety of cases cited by both parties, the referee said this case was similar to In re Disciplinary Proceedings Against Weigel, 2012 WI 124, 345 Wis. 2d 7, 823 N.W.2d 798. Attorney Weigel was charged with ten counts of misconduct involving failure to maintain proper trust account records and converting funds belonging to clients. He claimed the trust account violations already existed when the former founding member of his law firm was bought out by Attorney Weigel and others. At times, the trust account may have been out of balance as much as $1,000,000, but by the time Attorney Weigel was charged the out of balance amount was down to $100,000.

¶66 The referee noted that Attorney Weigel claimed, as Attorney Menard does here, that the OLR did not present testimony from a client or third party demonstrating an actual monetary loss. Therefore, he argued that the OLR had failed to prove conversion. The referee noted that this court disagreed, noting that an attorney must hold the property of others with the care required

24

of a professional fiduciary.  This court described Attorney Weigel's conduct, just as Mary Hoeft Smith did here, as "robbing Peter to pay Paul," and this court revoked Attorney Weigel's license to practice law.

¶67  The referee said that the conduct in Weigel is almost on all fours with the conduct involved here and in both cases, over an extended period of time, client trust funds were used as slush funds to pay off other clients, firm expenses, or whatever was most pressing at the moment.  The referee said that Attorney Menard's trust accounts, as the Weigel trust account, were continuously overdrawn or out of trust.  The referee said the amount converted here, well over $1,000,000, is in the same order of magnitude as in Weigel, and likely represents just the tip of the iceberg.  In addition, the referee noted that over $4,600,000 was out of trust over a span of four years.  The referee agreed with the OLR that revocation was the appropriate remedy.  He said:

> The scope of Respondent's conduct in playing fast and loose with client money is simply breathtaking.  Proper trust account records were never kept; money belonging to clients was commingled with that of other clients and used to pay vast sums in law firm and personal expenses; clients were not paid in a timely basis and often did not get paid until they complained; one client (ironically Respondent's uncle) was never paid at all – under some misguided theory that the attorney was entitled to the full proceeds of the settlement – and had to sue his own nephew for the nonpayment.
>
> This is far-reaching, deplorable and disreputable conduct.  It reflects poorly on the practice of law in general and has jaded those clients that Respondent was to have served.  This is clearly not the way lawyers should conduct themselves. Jeopardizing over $1,000,000 of client money on an extended 'rob Peter to pay Paul'

25

scheme is totally unacceptable. So is failing to keep over $4,600,000 in trust.

¶68 In addition to recommending revocation of Attorney Menard's license, the referee recommended that Attorney Menard be ordered to make restitution as follows:

- To C.M. the sum of $459.58

- To B.H. the sum of $5,000.32

- To J.B. the sum of $12,648.44

- To J.L.-M. the sum of $4,346.57

- To P.D. the sum of $1,100

- To J.S. the sum of $74,137.58 (less any or all of the $5,395.72 amount which Attorney Menard can demonstrate was paid on behalf of J.S. for legitimately due and owing medical expenses).

¶69 Finally, the referee recommended that Attorney Menard pay the full costs of the proceeding.

¶70 Attorney Menard has appealed the referee's recommendation of revocation as the appropriate sanction. He asserts that appropriate discipline should be a suspension between 18 and 24 months.

¶71 Attorney Menard notes that he testified at the evidentiary hearing that there were several reasons why he developed the practice of obtaining client consent to commingle funds in his business account rather than depositing them in trust, and for obtaining durable power of attorney forms from all clients in order to do so in the first place. He says he testified that some of his clients did not have bank accounts and they asked him

to cash checks and pay portions of the proceeds on demand, while other clients were afraid that depositing a large settlement check into their own accounts might upset their SSDI or Medicare status. He says still others felt overwhelmed with the prospect of having to resolve unpaid medical expenses and liens on their own out of the settlement proceeds and Attorney Menard agreed to handle those tasks on his clients' behalf. He says during the pertinent timeframe, his law business was generally good and he never perceived his accounting practices as "robbing Peter to pay Paul."

¶72 Attorney Menard says the evidence showed that none of his clients or former clients were harmed by his conceded trust account violations, with the exception of J.S., who he acknowledges is still owed $60,000 and who recently filed a claim with the Wisconsin Lawyers' Fund for Client Protection. However, he says he "was willing to pay whenever she requested" and she had stopped making requests.

¶73 Attorney Menard argues that "his business practices were uniquely set up in such a way to create financial flexibility for the benefit of his clients, and were set up as such with the expressed consent of his clients." He says the referee fails to discuss or simply overlooked the following:

- Attorney Menard has never previously been the subject of a disciplinary proceeding.
- Attorney Menard's bookkeeping practices were previously reviewed by the OLR in the context of a client complaint and were found to be satisfactory.

27

- Mary Hoeft Smith admitted her investigation was both rushed and incomplete.

- Each and every client identified had signed a durable power of attorney and consent form for their funds to be commingled.

- With the exception of P.M., which the matter has been resolved, not a single client at issue has made a claim for restitution to date.

¶74 Attorney Menard argues that the OLR fell short of proving that the alleged amounts that the referee recommends be paid as restitution were in fact owed. He complains that the OLR presented evidence inferring that, if Attorney Menard could not produce documentation proving full payment of settlement proceeds, when it was abundantly clear that his recordkeeping practice was sloppy at best, then he must owe restitution in the presumed, unproven deficit amount, irrespective of the fact that no one, except P.M., whose case has been settled, had made a claim against Attorney Menard for restitution owed. Attorney Menard again acknowledges that he is a poor record keeper, but he says poor recordkeeping and the absence of documentation available to confirm full satisfaction of settlement proceeds owed to clients is not the same as clear, satisfactory, and convincing evidence of nonpayment.

¶75 Attorney Menard complains that the referee unfairly compared his case to Weigel, in which the attorney's license was revoked. He says:

28

> [H]is case is uniquely situated in that the evidence showed that his clients were made fully aware of the commingling at issue. In most, if not all cases, the evidence showed that his clients provided consent and/or signed waivers permitting Menard to hold on to their settlement proceeds, satisfy outstanding medical/third-party liens, and pay out client's shares in lump sum allocations on an 'as needed' basis.

He also says unlike Weigel, he did keep records and settlement statements "providing a detailed picture of each and every client settlement and accounting of funds commingled, albeit, sloppy, unorganized records." Id.

¶76 Attorney Menard argues the fact he kept all of his clients and former clients informed about his accounting practices and the commingling of funds for purposes of resolving medical bills, negotiating subrogation liens, and paying clients structured settlement proceeds should have been a factor taken into consideration by the referee but it was not.

¶77 Rather than revocation, as was ordered in Weigel, Attorney Menard argues that his case is more similar to In re Disciplinary Proceedings Against Voss, 2014 WI 75, 356 Wis. 2d 382, 850 N.W.2d 190. The complaint in Voss alleged 11 counts of misconduct arising from Attorney Voss' work as a court-appointed guardian. Rather than setting up a guardianship account to handle his clients' income and expenses, Attorney Voss used a personal checking account not subject to interest accrual as a standard IOLTA account would have been, and he did not establish a separate fiduciary account for his clients' assets. In suspending Attorney Voss' license for 18 months, this court held that in spite of the fact it was Attorney Voss' third instance of

29

discipline, that the conduct went on for a significant period of time and that the client at issue was vulnerable, revocation was reserved for the most egregious cases and Attorney Voss' conduct, although serious, did not rise to that level.

¶78 The OLR argues that revocation is indeed appropriate for Attorney Menard's admitted 30 counts of misconduct. The OLR points out that although Attorney Menard claims he obtained powers of attorney or some other agreement from his clients purporting to authorize him to use their money as he saw fit, no such documents were ever introduced into evidence. In addition, the OLR says even if Attorney Menard had induced his clients to sign such documents, this would amount to nothing more than an attempt to circumvent this court's clear cut ethical rules, and even Attorney Menard confirmed that his scheme did not change his underlying ethical obligations or excuse the underlying misconduct.

¶79 As for Attorney Menard's claim that one reason he deposited client money into his business account was to shield clients from negative consequences in relation to their government benefits, the OLR says even if Attorney Menard was holding client funds to shield them from government discovery, he fails to explain why he could not have held that money in his trust account rather than his business account. In addition, the OLR says Attorney Menard does not explain why this alleged motivation required or allowed him to convert client funds to his own use. It says "under his theory the clients needed their money hidden, not spent by their attorney." In addition, the OLR says this claimed motivation smacks of fraud. The OLR asks whether Attorney Menard was hiding

client funds in his bank account so that government entities would not factor those sums into his clients' benefit eligibility determination. If so, it says it was not his place to assist clients in circumventing government benefit eligibility standards.

¶80 The OLR says another justification used by Attorney Menard is the fact that an alleged former client named Jessup, who he claims filed a grievance against him, resulted in an OLR investigation that ultimately resulted in no discipline. The OLR says this purported "evidence" provides no defense whatsoever since there is no evidence in the record as to the existence or facts of any Jessup grievance; what investigation, if any, the OLR did; or what the OLR advised or did not advise Attorney Menard regarding the matter. The OLR says it is barred by this court's rules from even confirming or denying that any client named Jessup ever filed a grievance. It notes that upon its objection at the evidentiary hearing, the referee confirmed he would not factor the alleged Jessup grievance into his decision.

¶81 The OLR says Attorney Menard's conduct is not analogous to that in the Voss case because Attorney Menard repeatedly conceded he did use client funds for his own personal or business needs and, unlike Voss, the conversions here involved at least 12 clients over the course of many years. In addition, the OLR notes Attorney Menard's conversions total over $1,000,000 and his out of trust deposits exceeded $4,000,000.

¶82 The OLR says the referee appropriately concluded that this case was analogous to Weigel. The OLR notes that Attorney Weigel's license was revoked despite no finding that his

31

conversions were to pad his own pocket, whereby in this case Attorney Menard repeatedly converted funds not only to pay clients and others in client matters, he also converted funds to his own use.

¶83 The OLR also argues that the referee appropriately ordered restitution in the amounts set forth above. While Attorney Menard complains that the OLR's restitution request shifts the burden of proof on restitution to him, the OLR says it repeatedly asked Attorney Menard for documents to support any payments he made to or on behalf of clients. It says Mary Hoeft Smith conducted her analysis based on what Attorney Menard produced and what she received from his banks. The OLR says while Attorney Menard is correct that SCR 22.38 requires the OLR to prove misconduct by evidence that is clear, satisfactory, and convincing, he fails to note the impact of SCR 22.39, which shifts the burden of proof to a respondent who fails to produce trust account records to the OLR, or provide an accounting or fiduciary property to the OLR by creating a presumption of trust account misconduct. See SCR 22.39(2). The OLR says Attorney Menard did not provide it with trust account records or accountings, and Mary Hoeft Smith had to recreate those records. The OLR says, "Menard did not provide a scintilla of documentary evidence, much less evidence that is clear, satisfactory or convincing to rebut OLR's restitution proof or any presumption permitted under SCR 22.39."

¶84 The OLR says Attorney Menard mischaracterizes Mary Hoeft Smith's testimony about her investigation by calling it "rushed and incomplete." The OLR says she never said any such thing and

32

to the contrary she testified that the OLR prioritized promptly presenting the case to the Preliminary Review Committee with some clients rather than waiting to conduct an exhaustive audit of each and every one of Attorney Menard's clients.

¶85 The OLR concludes by saying that the testimony at the hearing was clear, unequivocal, and compelling that Attorney Menard used his clients' funds as his own personal slush fund or piggy bank rather than holding them in trust as required by Supreme Court Rules. It says his scheme displayed an utter disregard for the most fundamental of an attorney's fiduciary obligations: the duty to hold his clients' funds in trust. It says his "rob Peter to pay Paul" pyramid scheme violates a most basic and important part of the Supreme Court Rules.

¶86 In his reply brief, Attorney Menard continues to argue that he tried to create a flexible and transparent accounting system for the benefit of his clients and with their expressed consent. He also argues that the previous Jessup investigation had an effect on his perception that his accounting practices were acceptable and creates at least an explanation for why those practices continued to be used. He says he has learned a painful lesson from this experience and is not at risk of repeating it. He asks the court to impose a suspension between 18 and 24 months.

¶87 A referee's findings of fact will not be set aside unless clearly erroneous. Conclusions of law are reviewed de novo. See In re Disciplinary Proceedings Against Eisenberg, 2004 WI 14, ¶5, 269 Wis. 2d 43, 675 N.W.2d 747. This court is free to impose whatever discipline it deems appropriate, regardless of the

referee's recommendation.  See In re Disciplinary Proceedings Against Widule, 2003 WI 34, ¶44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶88  Attorney Menard stipulated to 30 counts of misconduct. The record clearly supports the referee's findings of fact, based on that stipulation, that the OLR met its burden of proof on all of those counts.

¶89  Turning to the appropriate sanction, upon careful review of the matter, we agree with the referee that revocation of Attorney Menard's license is appropriate.  Although no two disciplinary cases are identical, we agree with the referee's assessment that this case is very similar to Weigel.  Here, as in Weigel, monies belonging to one client were routinely used to pay off other clients as well as firm and personal expenses.  As in Weigel, in virtually every client matter he handled, Attorney Menard "robbed Peter to pay Paul."  As we said in Weigel:

> [I]t would be difficult to imagine a more aggravated pattern of misconduct than the one presented here. We agree with the OLR that any sanction less than revocation would undermine the public's confidence in the honesty and integrity of the bar. Revocation . . . is the only sanction proportionate to the seriousness of the misconduct, and revocation will also protect the public, the courts, and the legal system, and it will deter other lawyers from engaging in similar misconduct.  Weigel, 345 Wis. 2d at 39.

¶90  We also agree with the referee's recommendations that Attorney Menard should be assessed the full costs of the proceeding and that he should be ordered to make restitution to the clients mentioned above.

34

¶91 IT IS ORDERED that the license of Robert C. Menard to practice law in Wisconsin is revoked, effective the date of this order.

¶92 IT IS FURTHER ORDERED that within 60 days of the date of this order, Robert C. Menard shall make restitution to the following clients:

- To C.M. the sum of $459.58
- To B.H. the sum of $5,000.32
- To J.B. the sum of $12,648.44
- To J.L.-M. the sum of $4,346.57
- To P.D. the sum of $1,100
- To J.S. the sum of $74,137.58 (less any or all of the $5,395.72 amount which Attorney Menard can demonstrate was paid on behalf of J.S. for legitimately due and owing medical expenses).

¶93 IT IS FURTHER ORDERED that within 60 days of the date of this order, Robert C. Menard shall pay to the Office of Law Regulation the costs of this proceeding, which are $18,191.42 as of October 25, 2019.

¶94 IT IS FURTHER ORDERED that the restitution specified above is to be completed prior to paying costs to the Office of Lawyer Regulation.

¶95 IT IS FURTHER ORDERED that, to the extent he has not already done so, Robert C. Menard shall comply with the provisions of SCR 22.26 concerning the duties of an attorney whose license to practice law has been revoked.

35

¶96  IT IS FURTHER ORDERED that the temporary suspension of Robert C. Menard's license to practice law, which was issued on March 20, 2020, is hereby lifted.

¶97  Rebecca Frank Dallet, J., did not participate.